E-FILED
Wednesday, 05 August, 2020  03:57:29 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-30014 |
| | ) | |
| THEODORE RICHARD, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, United States District Judge:

Theodore Richard moves for Compassionate Release and requests a Judicial Recommendation for Transfer to Home Confinement.

The Defendant also filed a Supplement to his Motion.

As directed, the Government filed a Response.

The Defendant was granted leave to file a Reply.

The Defendant has filed a second Supplement and the Government has responded.

The Defendant's medical records have also been filed as part of the record.

## I.     BACKGROUND

On March 14, 2018, after pleading guilty to conspiracy to distribute a controlled substance and, upon the Court's acceptance of the conditional guilty plea,

Defendant Theodore Richard was sentenced to 120 months imprisonment, followed by an eight-year term of supervised release.

The Defendant moves pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), the Second Chance Act of 2007 and 18 U.S.C. § 3621, for compassionate release, and further a recommendation to the Bureau of Prisons ("BOP") that he be placed in home confinement for the maximum period permissible.

On March 14, 2018, upon accepting the plea agreement and, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Court sentenced Mr. Richard to 120 months imprisonment, followed by 8 years of mandatory supervised release.  The Defendant is currently at FCI Terre Haute with a projected release date of August 20, 2025.

Based on his role in the offense, the ongoing COVID-19 pandemic, his age (66-years old) and his underlying medical conditions that render him particularly likely to suffer complications if he contracts the virus, the Defendant moves for compassionate release under the First Step Act.

The Government asks the Court to deny the motion, claiming that using compassionate release in this instance would fail to address a range of important

practical and legal problems and would not satisfy the standards under 18 U.S.C. § 3582(c)(1)(A).

## II.    DISCUSSION

Exhaustion of administrative remedies

Since President Trump signed the First Step Act into law on December 21, 2018, defendants may now bring their motions for compassionate release after exhausting administrative remedies within the Bureau of Prisons ("BOP").  *See* 18 U.S.C. § 3582(c)(1)(A).  The law provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on "extraordinary" or "compelling" reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]."  *See*  18 U.S.C. § 3582(c)(1)(A).

The Defendant represents that he made two requests of BOP for compassionate release.  Although he did not receive an official response, the Defendant's motion provides that Mr. Richard was verbally told that he would not be released because of his previous convictions, notwithstanding his age or health problems.  In any event, 30 days passed between the Defendant's requests for compassionate release and the filing of the motion.  Accordingly, the Court presumes

that Mr. Richard has exhausted his administrative remedies within BOP and the motion his properly brought.

Legal standard

The Court must also find that a sentence reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).  The First Step Act does not say what "extraordinary and compelling reasons" warrant a sentence reduction, but the compassionate release statute directs the Court to consider the sentencing factors of 18 U.S.C. § 3553(a) when deciding compassionate release motions.  *See* 18 U.S.C. § 3582(c)(1)(A).

Since passage of the First Step Act, the Sentencing Guideline policy statement has not been updated to reflect that defendants (and not only the BOP) may move for compassionate release but courts have turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction.  *See United States v. Weatherspoon*, 2020 WL 3803035, at *3 (S.D. Ind. July 7, 2020) (citations omitted).  The applicable guideline instructs that the Court should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release and the Court should not grant a sentence reduction if the defendant poses a risk of danger to the community, as defined in the Bail Reform Act.  *See* U.S.S.G. § 1B1.13.  Application Note 1 states

that extraordinary and compelling reasons exist if the defendant is "suffering from a serious physical or medical condition," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13, comment (n.1).

Certainly, the COVID-19 pandemic is in and of itself an extraordinary and unprecedented event in our lifetimes.  However, "the mere existence of COVID-19 in society and possibility that it may spread to a particular prison alone cannot independently justify compassionate release."  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).   "Perhaps a prisoner could satisfy the extraordinary and compelling reasons requirement by showing that his particular institution is facing a serious outbreak of COVID-19 infections, the institution is unable to successfully contain the outbreak, and his health condition places him at significant risk of complications should he contract the virus."  *United States v. Melgarejo*, 2020 WL 2395982, at *3 (C.D. Ill. May 12, 2020); *see also United States v. Johnson*, 2020 WL 2573239, at *4 (C.D. Ill. May 21, 2020).

<u>FCI Terre Haute</u>

According to BOP, the Defendant is housed at Terre Haute FCI in the Federal Prison Camp portion of the complex.  The Government notes that the facilities of Terre Haute are broken down into three separate and distinct housing facilities: United States Penitentiary (USP), a high-security facility; the Federal Correctional Institution (FCI), a medium security facility; and the Federal Prison Camp (FPC), a minimum security facility.  Terre Haute FCI has approximately 1,267 inmates, who are separated between the Camp (276 inmates) and FCI (991 inmates).

At the time of the Defendant's motion, FCI Terre Haute had one positive case of the virus.  The BOP website now reports no positive tests among inmates at FCI Terre Haute and one positive test among staff members.   www.bop.gov/coronavirus (last visited August 5, 2020).  One inmate and two staff have recovered.  *Id*.  USP Terre Haute reports no positive cases among inmates, with one inmate death and eight inmates having recovered.  *Id*.  The Government reports that these facilities are distinct from one another and are drivable distances apart.  Accordingly, they do not share any of the same facilities.  The restriction of movement includes staff and the facilities do not share staff unless absolutely necessary.

Vigo County, Indiana, where FCI Terre Haute is located, now has at least 516 confirmed cases of COVID-19 with 11 deaths.  *See* www.vigocounty.in.gov/department/index.php (last visited August 4, 2020).

In a supplement to his motion, the Defendant states that the relatively few positive tests is tied to the lack of testing provided for inmates at FCI Terre Haute. The BOP website reports that, as of August 5, 2020, 162 tests have been completed at FCI Terre Haute, while another 57 are pending.  That amounts to approximately 17% of the inmates at FCI Terre Haute.

The Defendant's supplement also cited these further problems at FCI Terre Haute:

1. A lack of opportunity to social distance as eight inmates are housed in an 8' by 16' cell that includes four bunk beds and eight lockers;

2. lack of clean face masks;

3. no hand sanitizer has been provided for the inmates;

4. unsanitary bathroom conditions include mold on shower walls and curtains, sharing of bars of soap between inmates, lack of disposable towels and infrequent cleaning of bathrooms (1-2 times a week);

5. failure to clean or wipe down computers and telephones after each individual use;

6. poor ventilation throughout the camp;

7. shared ventilation system between quarantine unit and non-quarantine unit;

8.  failure of camp staff to utilize face masks, including guards during the multiple daily counts, camp counselors during unit and office visits, and camp unit managers during unit and office visits; and,

9.  failure of guards to use gloves during room searches.

The Government claims that Rob Schalburg, the Supervising Attorney for Terre Haute, has reviewed the complaints and grievances outlined in the Defendant's supplemental motion. The camp where the Defendant is housed is a dormitory style setting. Therefore, the facilities are less crowded and provide more space to each individual than general housing facilities. Moreover, each inmate has been provided with a facemask for situations in which social distancing is more difficult, which can be cleaned with their laundry upon request. Cleaning of the premises occurs daily and the Defendant's claim that inmates must share soap is incorrect. According to Mr. Schalburg, soap can be purchased at the commissary and is provided by the prison, as are other cleaning and healthcare supplies. Hand sanitizer is not provided to inmates because soap, which has been noted by the CDC to be a better cleaning and preventative agent than hand sanitizer, is provided wherever needed.

The Government further states that Terre Haute has an individual whose sole job is to wipe down the telephones and computers after each use. Moreover, the supervisor of the camp even held a town hall with the inmates to address the need to wait until the items had been wiped down prior to each use.

Additionally, the Government claims Terre Haute has continued to abide by strict guidelines regarding interactions between staff and inmates.  Anyone coming from outside the Terre Haute facility, even if they were there previously, is subject to a fourteen-day quarantine.  Individuals who are symptomatic are placed into isolation cells away from other inmates.

In his reply, the Defendant notes that the union representing law enforcement officers at the Terre Haute Prison complex has described a number of problems which could lead to the spread of COVID19 within the facility, including inmates coming in and out unnecessarily, inmates being brought from coronavirus "hot spots," confined spaces and allowing employees to come to work after being screened with a high fever.

<u>Richard's individual circumstances</u>

The Defendant's motion cites Mr. Richard's age, high blood pressure, glaucoma and weakening of immune system from his prescribed medications make him among the "high-risk" individuals susceptible to COVID-19 complications. The Defendant alleges this combination of circumstances provide a compelling reason for a sentence reduction.  Because he has two of the serious health conditions identified by the Centers for Disease Control and Prevention ("CDC") that place him

at high risk, the Defendant states he is among those with the highest risk of death or serious illness.  Glaucoma does not appear on the CDC's list.

According to the CDC, the risk for severe illness from COVID-19 increases with age.  Eight out of 10 COVID-19 deaths have been in adults 65 years old and older.

As an incarcerated person, it is impossible for Richard to follow the CDC's recommendations to protect himself from exposure to this transmittable disease.  The Defendant claims that this risk of serious illness or death, along with the other relevant factors in this case, presents an extraordinary and compelling basis for a sentence reduction.

According to a recent BOP Health Services Inmate Report attached to his supplement, the Defendant's health issues include Glaucoma, Hypertension and abnormal blood chemistry.  The Defendant's BOP Health Records consist of several hundred pages.

The Court agrees that Mr. Richard's age and one health condition—particularly hypertension—may place him at a significant risk of severe complications from COVID-19.  According to the CDC, people with hypertension "**might be at an increased risk** for severe illness from COVID-19." www.cdc.gov/coronoavirus/2019-ncov/need-extra-precautions/people-with-

medical-conditions.html.  The Government notes that a recent study published in the American Journal of Hypertension states, "In conclusion, there is as yet no evidence that hypertension is related to outcomes of COVID-19, or that ACE inhibitor or ARB use is harmful, or for that matter beneficial, during the COVID-19 pandemic." academic.oup.com/ajh/article/33/5/373/5816609 (published April 6, 2020). Individuals with pulmonary hypertension do have an increased risk of severe illness from COVID-19. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Mr. Richard has not been diagnosed with pulmonary hypertension.

It is worth noting that Terre Haute FCI appears thus far to have been fairly successful in containing the virus.  The Court certainly recognizes that more COVID-19 cases may be present than testing has revealed and there are no guarantees that the positive rate will remain low in the future.  Nevertheless, it is significant that FCI Terre Haute has a very low number of active cases and has shown an ability to contain any outbreaks thus far.

Second supplement to motion

In his second Supplement, the Defendant states that on July 21, 2020, he was diagnosed with hyperparathyroidism, which is "a condition in which one or more of the parathyroid glands become overactive and secrete too much parathyroid

hormone (PTH).  This causes the levels of calcium in the blood to rise, a condition known as hypercalcemia."   www.my.clevelandclinic.org/health/diseases/14454-hyperparathyroidism  (last accessed August 5, 2020).    The Defendant states there will be more tests in the near future and surgery may be necessary if treatment does not work.

The Government notes that neither hyperthyroidism, nor hyperparathyroidism appear on the CDC's list of health conditions that would place individuals at a heightened risk of severe illness from COVID-19.  www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed on August 5, 2020).

At the time the Defendant filed his second supplement on July 26, 2020, there were at least 4,288 federal inmates and 401 BOP staff members who had "open" and "confirmed" cases of COVID-19.

The BOP website provides that there are 128,542 federal inmates in BOP-managed institutions and 13,663 in community-based facilities. www.bop.gov/coronavirus (last accessed August 5, 2020).  There are approximately 36,000 BOP staff.  *Id*.  The website reports there are 2,017 federal inmates and 542 BOP staff who have confirmed positive tests for COVID-19, while 8,663 inmates and 720 staff have recovered.  *Id*.  There have been 10,748 positive tests for inmates

out of the 38,364 tests that have been performed.  *Id*.  There have been 108 federal inmate deaths and 1 BOP staff member death due to COVID-19.  *Id*.

FCI Terre Haute reports that one staff member is positive.  *Id*.  One inmate has recovered and two staff members have recovered.  *Id*.  There are no active cases among inmates at FCI Terre Haute.  *Id*.

The Defendant claims that BOP is underreporting its COVID-19 cases, noting that an employee who was involved in planning the July 14, 2020 federal execution at FCI Terre Haute and who had tested positive for coronavirus was not listed as a positive case on the BOP website.

The Defendant further asserts that, because of the recent execution, inmates at FCI Terre Haute were essentially on a weeklong lockdown with almost no coronavirus tests performed.  During this time, there was no regard for the health and safety of the inmates.  One inmate reported he was locked in a barn-like building with no food and no water for two days for over 20 hours each day.  Another inmate stated that inmates had to sleep on the floor with no masks and less than a foot apart from one another.  A third inmate indicated he was placed in a gym-like room for 22 hours with no bed, no food, no medication, no soap in the bathroom and no water until the inmates began to complain, at which time they were provided a large bowl

of water to share.  The Defendant contends there is obviously a complete disregard for the health and well-being of inmates, including those who are high-risk.

In its response, the Government states that it communicated with Alexis McGee, Attorney Officer at FCI Terre Haute, who said that FCI Terre Haute maintained BOP protocol and procedure during the execution while the facilities were on full lockdown.  Moreover, there have not been any cases of COVID-19 at the prison camp where the Defendant is housed.

There is no information that the Defendant's recently-diagnosed hyperparathyroidism places him at an increased risk for severe illness due to COVID-19.  While the Parties dispute whether FCI Terre Haute followed all protocols at the time of last month's execution, that institution continues to be more successful than many other prisons at avoiding any outbreaks.  The Court has no basis to doubt the number of cases that have been reported at FCI Terre Haute.

Section 3553 factors

Upon considering the § 3553(a) factors, the Defendant states that the sentencing purpose of providing just punishment does not warrant his exposure to a life-threatening illness.  The Defendant claims that the § 3553(a) factors in this case could be met by an order of home confinement as a condition of supervised release.

The Defendant also notes that, since he was incarcerated, the purposes of punishment have been achieved as he has not been subject to any disciplinary actions. Until the pandemic resulted in the lockdown of inmates, Mr. Richard was working in the Terre Haute community for the Habitat foundation. The Defendant also attaches to his Supplement a Certificate of Completion for successful completion of the Non-Residential Drug Treatment Program.

The Defendant further alleges that the factor concerning the need to provide a defendant with certain medical care also supports his release because BOP has not been providing him with adequate healthcare. Mr. Richard states that being released to a community with access to healthcare will dramatically reduce his risk of infection or complications from COVID-19. The Government alleges that records indicate he has had regular doctor visits thus far during his BOP term and his conditions are well managed with medication, including Hydrochlorothiazide, a diuretic commonly used to treat high blood pressure. A recent study in the New England Journal of Medicine, which examined the use of hypertension medication and the effects of COVID-19 concluded, "We found no substantial increase in the likelihood of a positive test for COVID-19 or in the risk of severe COVID-19 among patients who tested positive in association with five common causes of antihypertensive medications."     www.nejm.org/doi/10.1056/NEJMoa2008975 (published May 1, 2020). The Government asserts that Mr. Richard is receiving

adequate health care that is of a quality higher than he likely would receive outside of BOP.  Moreover, he is safer and the community is safer with the Defendant remaining in BOP custody.

The Court must consider the statutory factors in determining whether the Defendant is released.  The Defendant pled guilty to Conspiracy to Distribute a Controlled Substance and, because of a prior drug conviction, was subject to a minimum prison term of 120 months which he received.  The sentencing factors such as deterrence, the need to provide just punishment and protection of the public in particular weigh against granting compassionate release.  The Court certainly recognizes that, as individuals age, they are less likely to continue committing crimes.  When this crime was committed, however, Mr. Richard was almost 63-years old so it appears there remains a serious risk of recidivism.

Another statutory factor is the "history and characteristics of the Defendant." Mr. Richard has a long history of drug dealing crimes.  In 1992, he was convicted of drug distribution crimes in California state court and sentenced to 11 years in the California Department of Corrections.  The Defendant was released in April 1997. Most recently, Mr. Richard was sentenced in 1999 in California federal court to an aggregate prison term of 240 months for a number of controlled substance offenses. The Presentence Investigation Report (PSR) prepared in this case provides that the conduct underlying the Defendant's previous federal convictions began while he was

still an inmate at a California prison serving his 11-year sentence.  The PSR reports the Defendant was released from BOP in August 2011 and discharged from supervised release in August 2012.  The Defendant's offense conduct in this case began just over four years later in October 2016.

Under *Pepper v. United States*, 562 U.S. 476, 490-493 (2011), the Court should consider post-offense developments under § 3553(a).  The Defendant alleges Mr. Richard's conduct during his term of incarceration establishes that the purposes of punishment have been met.  Since being incarcerated, Defendant Richard has not been subject to any disciplinary actions.  Moreover, he has been working within the Terre Haute community for the Habitat Foundation.

The Court certainly commends Mr. Richard for the progress he has made and for making good use of his time.  However, the Court cannot agree that the lack of any disciplinary actions over the course of two years establishes that the purposes of punishment have been met.  The PSR reports that, in the approximately twelve years he served in BOP custody following his 1999 federal convictions, Mr. Richard incurred two relatively minor disciplinary infractions.  The Court finds that to be a very impressive disciplinary record.  Despite his model behavior during his prison term, however, the Defendant still committed the conspiracy to distribute cocaine offense a few years later.  Accordingly, the Defendant's conduct while incarcerated does not necessarily establish that the purposes of punishment have been met.

The Defendant contends that the totality of circumstances demonstrates that granting him compassionate release is "sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing. The Court is unable to agree. The Defendant engaged in the criminal conduct in this case less than four years ago. Based on that and his lengthy history of similar crimes, the applicable sentencing factors do not weigh in favor of compassionate release.

It also appears the Defendant is receiving adequate healthcare while in BOP custody. He has had regular doctor visits and the record suggests his conditions are well managed with medication.

The Defendant is unable to satisfy the "extraordinary and compelling reasons" requirement. The number of reported current and active COVID-19 cases among BOP inmates is less than half the number of cases that existed at the time the Defendant filed his supplement approximately ten days ago. Significantly, FCI Terre Haute has not faced a serious outbreak of COVID-19 infections like some prisons have. While the Defendant is over the age of 65, it is not known whether any of his health conditions place him at a significant risk of complications if he contracts the virus. The CDC states only that people with hypertension might be at an enhanced risk. Upon considering all of this information, including the statutory sentencing factors and the Defendant's criminal history, Mr. Richard has not shown that extraordinary and compelling reasons warrant a sentence reduction.

Home confinement

The Defendant states that the Court may recommend to the BOP that he serve the maximum time permitted in home confinement. Soon after President Trump declared the COVID-19 outbreak in the United States a national emergency, the Attorney General directed the BOP to prioritize the use of existing statutory authorities to transfer to home confinement those at-risk inmates who are non-violent and pose minimal risk of recidivism. Under the recently-enacted CARES Act, during the "covered emergency period" of this national emergency, "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

On April 3, 2020, the Attorney General made the finding that emergency conditions are materially affecting the functioning of the BOP, thereby allowing the BOP Director to review all inmates for home confinement. The Attorney General's Memorandum explained that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations." The Defendant alleges COVID-19 is materially affecting the operations

of all BOP facilities, as reflected by the fact that BOP has placed all facilities on a 14-day lockdown.

The Government notes that once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration.  *See* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment. . .").  The Defendant claims that courts are permitted to make post-sentence recommendations that the BOP consider RRC or home detention placement.  The text of § 3621(b) mentions "recommendations of the sentencing court" as one of the factors that BOP may consider in designating a place of imprisonment.  The statute does not expressly say that only recommendations made at the time of sentencing may be considered.  The Defendant notes that during the COVID-19 global pandemic, courts have made post-sentence recommendations that BOP consider a defendant be placed on home confinement.  While the Court lacks authority to direct the BOP to place the Defendant in home confinement, it would appear that § 3621(b) authorizes the Court to recommend placement in home confinement.

To the extent that the Court may be authorized to make such a recommendation, the Court believes that BOP generally is in a far better position to determine which inmates should be placed on home confinement.  Certainly, COVID-19 is materially affecting the operations at all prisons.  However, it appears

thus far to have been contained for the most part at FCI Terre Haute.   Because of that and upon considering the applicable statutory factors, The Court finds no basis to recommend to BOP that Defendant be placed on home confinement.

Ergo, Defendant Theodore Richard's Motion for Compassionate Release and Request for Judicial Recommendation for Transfer to Home Confinement [d/e 93] is DENIED.

The Clerk will terminate the motion to supplement [d/e 98] and the second motion to supplement [d/e 108].

ENTER: August 5, 2020

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge